**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

|  |  |
|---|---|
| DANIEL STEEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SONOCO PRODUCTS COMPANY, THE BOARD OF DIRECTORS OF SONOCO PRODUCTS COMPANY, THE EMPLOYEE BENEFITS COMMITTEE OF THE SONOCO RETIREMENT AND SAVINGS PLAN, and JANE AND JOHN DOES 1-20<br><br>Defendant. | Case No. 4:24-cv-03105-JD |

## FIRST AMENDED CLASS ACTION COMPLAINT

### I.     INTRODUCTION

1.     Plaintiff Daniel Steen, individually and on behalf of a class of similarly situated participants ("Plaintiff"), in the Sonoco Retirement & Savings Plan (the "Sonoco Plan"), and on behalf of the Sonoco Plan, files this Amended Complaint for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against Sonoco Products Company ("Sonoco" or the "Company"), the Board of Directors of Sonoco Products Company (the "Board"), the Employee Benefits Committee of the Sonoco Retirement & Savings Plan (the "Committee"), and Jane and John Does 1-20, the individual members of the Committee during the proposed class period whose names are currently unknown (the "Members") (collectively, Sonoco, the Board, the Committee, and the Members shall be referred to as the

"Defendants").

2.      The Plan is a defined contribution plan for Sonoco employees to save for their retirements. Most fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping) and investment management. Fiduciaries of defined contribution plans must engage in a rigorous process to control these costs to ensure that participants pay no more than a reasonable level of fees. This is particularly true for large plans, like the Sonoco Plan, which have the bargaining power to obtain the highest level of service at the best price.

3.      Defined contribution retirement plans, like the Sonoco Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans.[1]

4.      In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses."[2] Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Sonoco Plan to ensure every investment remains prudent.

5.      To safeguard participants and beneficiaries of retirement plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. These

---

[1] INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).
[2] *Tibble v. Edison Int'l*, 575 U.S. 523, 526 (2015).

twin fiduciary duties are "the highest known to the law."[3] Fiduciaries must act solely in the interest of the participants and beneficiaries with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.[4]

6.      Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement. Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan.

7.      The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[5]

8.      Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the Sonoco Plan's recordkeeper, and approving and/or contracting for Plan administrative services. Instead of acting for the exclusive benefit of the Sonoco Plan and its participants and beneficiaries when performing these duties, Defendants allowed the Sonoco Plan's recordkeeper to receive excessive compensation for the services it provided.

9.      As of December 31, 2022, the Sonoco Plan had 12,946 active participants and more than $1 billion in assets. Accordingly, the Sonoco Plan has (and had) substantial bargaining power regarding the fees and expenses charged against participants' investments. However, during the

---

[3] *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).
[4] 29 U.S.C. § 1104(a)(1)(B).
[5] U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf

putative class period, Defendants, as fiduciaries of the Sonoco Plan, breached their duty of prudence they owed by requiring the Sonoco Plan to pay excessive recordkeeping and administration (hereinafter "RKA") fees to its recordkeeper—Empower Annuity Insurance Company ("Empower") (formerly known as Great-West Life & Annuity Insurance Company ("Great-West"))—in light of the services received by the Sonoco Plan. Moreover, Defendants failed to monitor the fiduciaries responsible for the Sonoco Plan administration with regard to RKA fees.

10.     Plaintiff also challenges Defendants' use of forfeited, unvested Company contributions exclusively to reduce its responsibility to contribute to employee retirement accounts. In so doing, Defendant uniformly exercised its discretion over those funds to benefit its own bottom line, and reduce its contribution obligations, to the detriment of Plan participants by refusing to use these forfeited funds to defray administrative expenses paid by Plan participants.

11.     Defendants' mismanagement and misconduct constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendants' actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Sonoco Plan and its participants millions of dollars.

12.     Plaintiff brings this action by and through undersigned attorneys based upon personal knowledge and information obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further substantial support for the allegations in this Complaint.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is an action arising under the law of the United States pursuant to 29 U.S.C. §1132(a)(2) and (3), which provides for federal jurisdiction of actions brought under Title I of

ERISA, 29 U.S.C. § 1001, *et seq*.

14.     The Court has personal jurisdiction over each of the Defendants because they reside and/or transact business in—and have significant contacts—within this District, ERISA provides for nationwide service of process, the Plan was administrated in this District, and the breaches of ERISA took place herein.

15.     Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2) because this District is where the Sonoco Plan is and was administered, where at least one of the alleged breaches of ERISA took place, and where (at least) one of the Defendants reside. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because a defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred here.

### III.     PARTIES

16.     Plaintiff Daniel Steen is a resident of Hartsville, South Carolina. He participated in the Sonoco Plan during the entire Class Period.

17.     Plaintiff, like all Sonoco Plan participants, was not provided any information regarding the substance of Defendants' deliberations, if any, concerning the Sonoco Plan's selection of service providers during the Class Period.

18.     Defendant Sonoco is a South Carolina corporation with its principal place of business in Hartsville, South Carolina. Sonoco is a packing solutions company, and is the Sonoco Plan's Sponsor.

19.     Sonoco, acting through its Board, appointed the Committee to be responsible for selecting and monitoring investment options and administrative service providers for the Sonoco Plan. Accordingly, each member of the Board is/was a fiduciary of the Sonoco Plan, within the

meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over plan management and/or authority or control over management or disposition of Sonoco Plan assets.

20.     The Board and the unnamed members of the Board during the Class Period (referred to herein as Jane and John Does 1–10) are collectively referred to herein as the "Board Defendants."

21.     Defendant, the Committee, is comprised of employees and/or partners of the Company. The Committee has the discretionary authority to determine the investment funds made available under the Sonoco Plan, and to vet and select service providers to administer the Sonoco Plan.

22.     The Committee and each of its members were fiduciaries of the Sonoco Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Sonoco Plan assets.

23.     The Committee and the unnamed members of the Committee during the Class Period (referred to herein as Jane and John Does 11–20) are collectively referred to herein as the "Committee Defendants."

24.     At all material times, including during the Class Period, Defendants were fiduciaries to the Sonoco Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii).

### A.     The Sonoco Retirement & Savings Plan

25.     The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a)

26.     The Plan is also a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

27.     Eligible Sonoco employees may participate in the Sonoco Plan. The Plan provides the primary source of retirement income for many Sonoco employees. The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Sonoco Plan by Defendants and the fees paid out of the Sonoco Plan assets.

28.     The Company is the Sonoco Plan Administrator. Accordingly, it had (and has) exclusive authority and responsibility for all matters in connection with the operation and administration of the Sonoco Plan, including the authority and responsibility to invest, manage, and control the assets of the Sonoco Plan specifically allowed to the Trustee. At some or all times during the Class Period, the Company, through the Board, delegated some or all of these responsibilities to the Committee and its Members.

29.     The Plan is recordkept by Empower, which provides recordkeeping and related services with respect to retirement plans. Empower has served as the Sonoco Plan's recordkeeper for the entirety of the class period.

30.     Defendants are vested with the obligation to determine the appropriateness of the Sonoco Plan's investment offerings, monitor investment performance, and review Plan and fund expenses each year.

31.     Plan participants have their own accounts within the Sonoco Plan to which they may contribute a portion of the compensation they earn from their employment at the Company. The Company also has the discretion to compensate employees through matching contributions. Participants can direct the investment of the assets allocated to their individual accounts into the investment options approved by the Committee and offered by the Sonoco Plan, and the return on

7

those investments are credited to each participant's account.

32.     The Recordkeeper of a defined contribution plan, like the Sonoco Plan, maintains participant account balances, provides a website and telephone number for the Sonoco Plan Participants to monitor and control their accounts, and provides various other services to the Sonoco Plan.

**B.     Defendants' Fiduciary Status and Overview of Fiduciary Duties**

33.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

34.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

35.     As described above, Defendants were fiduciaries of the Sonoco Plan because they:

a.     were so named;

b.     exercised authority or control respecting management or disposition of the Sonoco Plan's assets;

c.     exercised discretionary authority or discretionary control respecting

8

management of the Sonoco Plan; and/or

d.      had discretionary authority or discretionary responsibility in the administration of the Sonoco Plan.

36.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Sonoco Plan, and its investments, solely in the interest of the Sonoco Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

37.     According to the Department of Labor, employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to ensure they remain appropriate choices.[6] Excessive expenses decrease an account's immediate value and deprives the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

38.     Specific to recordkeeping costs, prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. They must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are

---

[6] *See* U.S. Department of Labor, Employee Benefit Security Administration, *Meeting Your Fiduciary Responsibilities*, 12 at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited Apr. 23, 2024) (hereinafter "DOL Fiduciary Publication") ("If you are hiring third-party service providers, have you looked at a number of providers, given each potential provider the same information, and considered whether the fees are reasonable for the services provided?"); *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan).

reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected.[7]

39.     Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence."[8]

40.     Prudent plan fiduciaries ensure they are paying only reasonable recordkeeping fees by engaging in an "independent evaluation," *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022), and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Sonoco Plan.[9, 10] After obtaining bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and quality of services for a more competitive reasonable fee if necessary.

41.     As part of the deliberative process of selecting and monitoring a plan's recordkeeper, prudent fiduciaries must identify *all fees*, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To

---

[7] *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

[8] *Hughes II v. Nw. Univ.*, 63 F.4th 615, 625–26 (7th Cir. 2023).

[9] *See, e.g.*, U.S. Department of Labor, Understanding Retirement Plan Fees and Expenses, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Apr. 23, 2024)

[10] The accepted standard of care prevailing among industry experts is to solicit competitive bids every three to five years. *See* CapTrust, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal record-keeper search and selection process conducted approximately every three to five years.").

the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

42.    Because, for all practical purposes, recordkeeping services are treated as a commodity by prudent plan fiduciaries, fee comparisons are used by prudent plan fiduciaries to understand the range of recordkeeping fees paid in the market.

43.    During the Class Period, Defendants did not act prudently or in the best interests of the Sonoco Plan's participants. Defendants caused the Sonoco Plan and its participants to pay excessive administration fees and excessive recordkeeping compensation to Empower.

44.    As set forth in detail below, Defendants breached fiduciary duties to the Sonoco Plan and its participants and beneficiaries and are therefore liable for their breaches and the breaches of its co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

C.    **Allegations Specific to Recordkeeping and Administration Services and Fee Claims**

45.    Defined contribution plan fiduciaries of large 401(k) plans hire service providers to deliver retirement plan benefits to their employees. "Recordkeepers" are the services providers that have developed service offerings that can meet all the needs of large retirement plans with a prudent and materially identical level and caliber of services.

46.    Nearly all recordkeepers in the marketplace offer the same range of services. Many of the recordkeeping services can be provided by recordkeepers at very little cost. The recordkeeper of a defined contribution plan, like the Sonoco Plan, maintains participant account balances, provides a website and telephone number for Plan Participants to monitor and control their Plan accounts, and provides various other services to the Sonoco Plan.

11

47.    There are no material differences between the services that are offered and provided by national recordkeepers, like Empower, Fidelity, Vanguard, Principal, Prudential, T. Rowe Price, Transamerica, John Hancock, Voya, Schwab, among others. Rather, some recordkeepers may differ slightly in how they deliver recordkeeping services, but the recordkeeping services themselves are essentially a commodity.[11]

48.    As a result, prudent plan fiduciaries following the standard of care treat the services provided by recordkeepers as a commodity when ensuring that they pay only reasonable fees for those services both because the recordkeeping services are, in fact, materially a commodity, and also because treating them as such achieves the best results for the exclusive benefit of plan participants as required by ERISA.

49.    Providing recordkeeping services involves both fixed and variable costs. The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

50.    All else being equal, the more participants a plan has, the lower the fee per participant required by a recordkeeper to provide identical recordkeeping services to maintain the same profit margin. Prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

51.    Because recordkeeping costs are not affected by account size, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan,

---

[11] For example, in 2015, Eric Droblyen, the President and CEO of Employee Fiduciary, a full-service 401(k) provider, stated "[c]ustody and recordkeeping are 'commodity' services. Like any commodity, given materially equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and investment gains), recordkeeping compensation increases without any change in recordkeeping services.

### D.     Recordkeeping Services

52. Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed service offerings that can meet all the needs of mega retirement plans. Empower is one such recordkeeper.

53. These recordkeepers deliver all the essential RKA services through standard offerings of the same level and quality as other recordkeepers who service mega plans.

54. The fees charged by recordkeepers for RKA services are impacted primarily by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services.

55. Providing RKA services involves both fixed and variable costs. The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

56. All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

57. As a result, it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

13

58.     There are two types of essential RKA services provided by all recordkeepers. The first type, "Bundled RKA" services, include:

    a.    Recordkeeping;

    b.    Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c.    Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

    e.    Maintenance of an employer stock fund;

    f.    Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    g.    Plan consulting services including assistance in selecting the investments offered to participants;

    h.    Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

    i.    Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

    j.    Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

    k.    Trustee / custodian services.

59.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct

14

of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

    a.     Loan processing;

    b.     Brokerage services/account maintenance;

    c.     Distribution services; and

    d.     Processing of Qualified Domestic Relations Orders (QDROs).

60. In practice, there are no material differences between the services that are offered and provided by national recordkeepers, like Empower. Rather, some recordkeepers *may* differ slightly in *how* they deliver the services.

61. As an example, because the RKA offerings are materially identical among all recordkeepers who provide services to plans, like the Sonoco Plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing Bundled RKA services.

62. Similarly, in most cases differences in fee rates for A La Carte services are immaterial in determining the total fees charged by recordkeepers. To the extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will often reduce their A La Carte fee rates to be reasonable and competitive with what others are charging.

63. Hereafter, the sum of the Bundled RKA fees and the A La Carte RKA fees equals the "Total RKA" fees.

64.    As a result, comparisons of the Total RKA fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the Total RKA fees being paid by any specific plan.

65.    Additionally, any minor variation in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

66.    Since well before 2015, industry experts have maintained that for mega retirement plans like the Sonoco Plan, prudent fiduciaries treat RKA services as a commodity when negotiating with recordkeepers. "Custody and recordkeeping are 'commodity' services. Like any commodity, given materially equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

67.    When required by prudent plan fiduciaries, all national recordkeepers (including Empower) will quote fees for the Bundled RKA services for Mega plans on a per participant basis without regard for any potential minor plan-specific differences in the requested services, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

68.    Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

16

69. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA was stable for mega plans, including the Sonoco Plan. Reasonable Total RKA fees paid in 2018 are representative of the reasonable Total RKA fees during the entire Class Period.

70. The amount of compensation paid to Plan service providers must be *reasonable* (not the cheapest or the average in the market).

71. Reasonable, in turn, depends on contextually understanding the market for such RKA services at the time that the recordkeeping contract is entered into. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

72. Form 5500 disclosure documents require plan fiduciaries to disclose the direct and indirect compensation paid from plan assets and earned by recordkeepers for recordkeeping and administration ("RKA") service provided to the plan.

73. Retirement plan industry experts can use their experience and expertise to make comparisons of the Total RKA fees paid by plans. Comparison of the Total RKA fee rates are meaningful because, with few exceptions, any differences in services provided by recordkeepers have an immaterial impact on the Total RKA fees paid.

74. By going through a process to solicit bids (alternatively known as "Request for Proposal" or "RFP" process) at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

75. Prudent plan fiduciaries understand that because RKA services are essentially a

commodity and any variations in RKA services received are not material and do not prevent comparisons of the Total RKA fees paid by similarly situated comparable plans.

76. To begin with, the payments to Empower for RKA services were calculated and reported to the United States Department of Labor annually. The amounts Defendants originally disclosed to the Department of Labor as being paid to its recordkeeper are shown in Plaintiff's original Complaint. Doc. 1, at 13.

77. After this action was filed, Defendants purport to have "identified inadvertent reporting errors in Schedule C, block 2(d) of certain of its Form 5500s" identifying, *inter alia*, recordkeeping compensation which they sought to amend. Doc. 16, at 1–2. Defendant thereafter filed amended Form 5500s with the Department of Labor. Even as amended, though, it is clear Defendants substantially overpaid the Plan's recordkeeper, Empower.

78. The *corrected* payments were reported as:

| Year | Plan Participants with Balances | Empower's Compensation from the Sonoco Plan | Empower Compensation per Participant |
|---|---|---|---|
| 2018 | 9,755 | $633,754 | $65 |
| 2019 | 12,302 | $645,659 | $52 |
| 2020 | 12,643 | $703,528 | $56 |
| 2021 | 12,329 | $683,639 | $55 |
| 2022 | 12,946 | $604,904 | $47 |
| **Total** | | **$3,271,484** | |

79. Empower has been the Sonoco Plan's recordkeeper during the entirety of the Class Period. In fact, Empower has been the Sonoco Plan's recordkeeper since at least 2014.

80. Defendants failed to solicit bids for recordkeeping services at reasonable intervals,

18

which, in turn, has caused the Sonoco Plan to overpay for recordkeeping during the entire Class Period.

81.    To provide meaningful comparators that support an inference that the Sonoco Plan did not engage in a prudent process to ensure that it did not overpay for RKA services, Plaintiff considered the Total RKA fees that other comparable plans are paying (and paid) as evidence of the reasonable fee that a prudent plan fiduciary would have been able to obtain. Plaintiff considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s.

82.    It must be noted that detailed recordkeeping fee information is generally unavailable to the public and even to plan participants, making the pre-discovery comparison analysis difficult for plan participants. The ERISA § 404(a)(5) participant disclosures provide scant details of the full picture of direct and indirect RKA fees paid by a given plan or the specific RKA services provided by a given recordkeeper. And although recordkeepers are required to produce to plan sponsors an ERISA § 408(b)(2) fee disclosure document, which discloses both the RKA services provided and the compensation received for same, recordkeepers and plan sponsors do not make these disclosures available to participants or the public.

83.    Nevertheless, the RKA fees paid by comparable plans (from Form 5500 data) evidence that the Sonoco Plan paid excessive fees because there are no RKA services offered by any recordkeeper that would warrant or reasonably explain the disparity between the RKA fees paid by the Sonoco Plan and the RKA fees that other comparable plans received for the materially identical RKA services during the Putative Class Period.

84.    Accordingly, Plaintiff considered the Total RKA fees that other comparable plans are paying as evidence of the reasonable fee that a prudent plan fiduciary would have been able to

obtain. Plaintiff considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s.

85.    Moreover, to ensure meaningful and apples-to-apples comparisons, Plaintiff used the same methodology to compare the fees of the Sonoco Plan with the fees of other similarly situated and meaningfully comparable plans.

86.    Set forth below find more detailed information related to the Total RKA fees paid by other plans with a meaningfully similar number of participants. Specifically, each of the meaningfully comparable plans identified below is among the closest 3/100th of 1% (0.03%) of all the defined contribution plans covered by ERISA. More specifically, there were around 657,265 plans in 2018 and only 170 plans had between 9,356 and 10,770 participants with a balance greater than zero at year-end. Therefore, 657,095 plans or 99.97% of all plans have either less than 9,356 or more than 10,770 participants. Hence, plans containing between 9,356 and 10,770 participants are indisputably among the most meaningful and appropriate to use as similarly situated comparable plans and are superior to the remaining 99.97% of all the defined contribution plans governed by ERISA in 2018.

a.    **Children's Medical Center of Dallas Employee Savings Plan 403(B)** ("CMC"): The reliable estimate of $36/pp is derived from publicly available Form 5500 disclosure data.  The CMC plan is a meaningful benchmark because at the end of 2018 the CMC plan had around 9,356 participants, slightly less than the 9,755 participants in the Sonoco Plan. The fact that the Sonoco Plan had around 399 more participants than the CMC plan does not render the CMC plan a meaningless comparable plan. On the contrary, in terms of the number of participants and in relation to the Sonoco Plan, the CMC plan is one of the most similar defined

contribution plans governed by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 9,000 participants are driven primarily by the number of participants.

There are no material differences in the RKA services provided to plans as large as both the CMC plan and the Sonoco Plan and any service differentials cannot explain the disparity between the fees paid by the CMC plan and the fees paid by the Sonoco Plan. For example, the disparity of the $36/pp Total RKA rate for the CMC plan's fee compared to the Total RKA effective rate of $65/pp paid by the Sonoco Plan represents over $280,000.00 annually and would conservatively represent more than thousands of hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any comparable plan that would reasonably warrant incremental additional fees of over $280,000.00 for similar commoditized RKA services. Therefore, if the CMC plan can obtain a Total RKA fee of $36/pp with 9,356 participants, then the Sonoco Plan, with 9,755 participants at the end of 2018, should be able to obtain a Total RKA fee of around $36/pp, or lower, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate. The massive disparity between the Total RKA fees paid by the CMC plan and the Sonoco Plan's effective Total RKA fee of around $65/pp, viewed holistically and in conjunction with the evidence of the fees paid by other comparable plans, supports the reasonable inference that the Sonoco Plan paid excessive and unreasonable RKA fees and the Sonoco Plan's process was not prudent.

b.      **Ralph Lauren Corporation 401(K) Plan** ("Ralph Lauren"): The reliable estimate of $31/pp is derived from publicly available Form 5500 disclosure data.  The Ralph Lauren plan is a meaningful benchmark because at the end of 2018 the Ralph Lauren plan had around 9,389 participants, slightly less than the 9,755 participants in the Sonoco Plan. The fact that the Sonoco Plan had around 366 more participants than the Ralph Lauren plan does not render the Ralph Lauren plan a meaningless comparable plan. On the contrary, in terms of the number of participants and in relation to the Sonoco Plan, the Ralph Lauren plan is one of the most similar defined contribution plans governed by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 9,000 participants are driven primarily by the number of participants.

There are no material differences in the RKA services provided to plans as large as both the Ralph Lauren plan and the Sonoco Plan and any service differentials cannot explain the disparity between the fees paid by the Ralph Lauren plan and the fees paid by the Sonoco Plan. For example, the disparity of the $31/pp Total RKA rate for the Ralph Lauren plan's fee compared to the Total RKA effective rate of $65/pp paid by the Sonoco Plan represents over $330,000.00 annually. As described above, there are no special or different RKA services provided to any comparable plan that would reasonably warrant incremental additional fees of over $330,000.00 for similar commoditized RKA services. Therefore, if the Ralph Lauren plan can obtain a Total RKA fee of $31/pp with 9,356 participants, then the Sonoco Plan, with 9,755 participants at the end of 2018, should be able to obtain a Total RKA fee of around $31/pp, *or lower*, since it is

22

axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate. The massive disparity between the Total RKA fees paid by the Ralph Lauren plan and the Sonoco Plan's effective Total RKA fee of around $65/pp, viewed holistically and in conjunction with the evidence of the fees paid by other comparable plans, supports the reasonable inference that the Sonoco Plan paid excessive and unreasonable RKA fees and the Sonoco Plan's process was not prudent.

c.   **Vibra Healthcare Retirement Plan** ("Vibra"): The reliable estimate of $28/pp is derived from publicly available Form 5500 disclosure data. The Vibra plan is a meaningful benchmark because at the end of 2018 the Vibra plan had around 9,750 participants, slightly less than the 9,755 participants in the Sonoco Plan. The fact that the Sonoco Plan had around five more participants than the Vibra plan does not render the Vibra plan a meaningless comparable plan. The Vibra plan is one of the most similar defined contribution plans governed by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 9,000 participants are driven primarily by the number of participants. What's more, both the Vibra plan and the Sonoco Plan were recordkept during the relevant timeframe by the same recordkeeper: Great-West (the predecessor entity to Empower).

There are no material differences in the RKA services provided to plans as large as both the Vibra plan and the Sonoco Plan and any service differentials cannot explain the disparity between the fees paid by the Vibra plan and the fees paid by the Sonoco Plan. For example, the disparity of the $28/pp Total RKA rate for the Vibra plan's fee compared to the Total RKA effective rate of $65/pp paid

23

by the Sonoco Plan represents over $360,000.00 annually. As described above, there are no special or different RKA services provided to any comparable plan that would reasonably warrant incremental additional fees of over $360,000.00 for similar commoditized RKA services. Therefore, if the Vibra plan can obtain a Total RKA fee of $28/pp with 9,750 participants, then the Sonoco Plan, with 9,755 participants at the end of 2018, should be able to obtain a Total RKA fee of around $28/pp *or lower*. The massive disparity between the Total RKA fees paid by the Vibra plan and the Sonoco Plan's effective Total RKA fee of around $65/pp, viewed holistically and in conjunction with the evidence of the fees paid by other comparable plans, supports the reasonable inference that the Sonoco Plan paid excessive and unreasonable RKA fees and the Sonoco Plan's process was not prudent.

d.     **Republic National 401(K) Plan** ("Republic"): The reliable estimate of $33/pp is derived from publicly available Form 5500 disclosure data for the Republic plan. The Republic plan is a meaningful benchmark because at the end of 2018 the Republic plan had around 9,922 participants, slightly more than the 9,755 participants in the Sonoco Plan. The fact that the Sonoco Plan had around 167 fewer participants than the Republic plan does not render the Republic plan a meaningless comparable plan. The Republic plan is one of the most similar defined contribution plans governed by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 9,000 participants are driven primarily by the number of participants. What's more, both the Republic plan and the Sonoco Plan were recordkept during the relevant timeframe by the same recordkeeper: Great-West

24

(the predecessor entity to Empower).

There are no material differences in the RKA services provided to plans as large as both the Republic plan and the Sonoco Plan and any service differentials cannot explain the disparity between the fees paid by the Republic plan and the fees paid by the Sonoco Plan. For example, the disparity of the $33/pp Total RKA rate for the Republic plan's fee compared to the Total RKA effective rate of $65/pp paid by the Sonoco Plan represents over $310,000 annually. As described above, there are no special or different RKA services provided to any comparable plan that would reasonably warrant incremental additional fees of over $310,000 for similar commoditized RKA services. Therefore, if the Republic plan can obtain a Total RKA fee of $33/pp with 9,922 participants, then the Sonoco Plan, with 9,755 participants at the end of 2018, should be able to obtain a Total RKA fee of around $33/pp. The massive disparity between the Total RKA fees paid by the Republic plan and the Sonoco Plan's effective Total RKA fee of around $65/pp, viewed holistically and in conjunction with the evidence of the fees paid by other comparable plans, supports the reasonable inference that the Sonoco Plan paid excessive and unreasonable RKA fees and the Sonoco Plan's process was not prudent.

e.    **Southern California Permanente Medical Group Tax Savings Retirement Plan** ("SC Permanente"): The reliable estimate of $31/pp is derived from publicly available Form 5500 disclosure data for the SC Permanente plan. The SC Permanente plan is a meaningful benchmark because at the end of 2018 the SC Permanente plan had around 10,770 participants, slightly more than the 9,755

participants in the Sonoco Plan. The fact that the Sonoco Plan had around 1,015 fewer participants than the SC Permanente plan does not render the SC Permanente plan a meaningless comparable plan. The SC Permanente plan is a highly similar defined contribution plan to the Sonoco Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 9,000 participants are driven primarily by the number of participants.

There are no material differences in the RKA services provided to plans as large as both the SC Permanente plan and the Sonoco Plan and any service differentials cannot explain the disparity between the fees paid by the SC Permanente plan and the fees paid by the Sonoco Plan. For example, the disparity of the $31/pp Total RKA rate for the SC Permanente plan's fee compared to the Total RKA effective rate of $65/pp paid by the Sonoco Plan represents almost $330,000.00 annually. As described above, there are no special or different RKA services provided to any comparable plan that would reasonably warrant incremental additional fees of over $330,000.00 for similar commoditized RKA services. Therefore, if the SC Permanente plan can obtain a Total RKA fee of $31/pp with 10,770 participants, then the Sonoco Plan, with 9,755 participants at the end of 2018, should be able to obtain a Total RKA fee of around $31/pp. The massive disparity between the Total RKA fees paid by the SC Permanente plan and the Sonoco Plan's effective Total RKA fee of around $65/pp, viewed holistically and in conjunction with the evidence of the fees paid by other comparable plans, supports the reasonable inference that the Sonoco Plan paid excessive and unreasonable RKA fees and the Sonoco Plan's process was not prudent.

26

87.     The plans identified above are similarly situated in terms of the number of plan participants and are among the most meaningful comparable plans that could possibly be identified by Plaintiff.

88.     Additionally, all the plans that Plaintiff identifies as comparable plans follow the industry standard of care in terms of having a reasonably close number of participants.

89.     The below chart provides a comparison of Total RKA fee rates paid by these identified comparably sized plans for substantially similar RKA services.

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available)

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $337,416 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $290,066 | $31 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 9,750 | $277,532 | $28 | Great-West (now Empower) |
| Sonoco 2018 Fee | 9,755 | $633,754 | $65 | Great-West (now Empower) |
| Republic National 401(K) Plan | 9,922 | $324,171 | $33 | Great-West (now Empower) |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $333,038 | $31 | Vanguard |

90.     In the graph below, the white data points represent the Total RKA fee rate paid by the comparable plans identified above for the materially identical Total RKA services received by the Sonoco Plan.

91.     Those data points are used to generate the white trend line in the graph below which represents a Total RKA per participant fee rate for a given number of participants around which a plan fiduciary would expect to be able to negotiate through following the standard of care for prudent plan fiduciaries and utilizing a formal recordkeeper search and selection process.



92.     A reasonable direct fee for recordkeeping services is considerably less than what Empower charged. Setting aside the comparators addressed above, Empower's competitor, Fidelity, recently stipulated that "if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from **$14–$21** per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."[12]

93.     A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fees to ensure they are reasonable and remove recordkeepers if those fees are unreasonable or negotiate a new lower fee with the incumbent. *See Hughes*, 142 S. Ct. at 742.

---

[12] *Moitoso v. FMR*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

94.     During the putative class period, Defendants failed to regularly monitor the Sonoco Plan's RKA fees paid to Empower.

95.     During the putative class period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including, but not limited to, Empower, in order to avoid paying unreasonable RKA fees.

96.     During the putative class period, Defendants followed a fiduciary process that was imprudent given the objectively unreasonable RKA fees it paid to Empower, in light of the level and quality of RKA services it received.

97.     In sum, the disparity between the fees paid by the Sonoco Plan and the fees paid by the comparable plans identified above cannot be plausibly explained by immaterial service disparities since there are no material differences in the RKA services provided to plans as large as the Sonoco Plan and the comparable plans.

98.     The table and graph above illustrate that, in 2018, the Sonoco Plan paid Total RKA fees of $65 per participant, which is much higher than the Total RKA fees paid by the other comparable plans in 2018. This is not an anomaly, as the Sonoco Plan paid well in excess of the $28–$36 per participant in RKA fees for *each year* during the putative class period.

99.     When a plan fiduciary follows prudent practices as outlined by the Department of Labor and solicits bids from multiple recordkeepers in a competitive environment, some initial bids for the RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate Total RKA fees lower than the trend line such that the Total RKA fee would be proximate to the trend line.

100.     The table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Total RKA fee of around $32 per participant, if

not lower.

101. Although the Supreme Court noted in Hughes that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, reasonable tradeoffs did not exist because all recordkeepers were providing a materially identical level or quality of services and the Sonoco Plan could have received materially identical services from national recordkeepers other than Empower for a lower fee, or negotiated with Empower to accept a reasonable fee, had they adhered to the standard of care for prudent plan fiduciaries.

102. Defendants failed to take advantage of the Sonoco Plan's size to timely negotiate lower fees from its existing recordkeeper, Empower, and Defendants could have obtained the same RKA services for less.

103. Plaintiff paid these excessive RKA fees in the form of direct and indirect compensation to the Sonoco Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

### E.    Allegations Specific to Forfeiture Claims

104. In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund.

105. The Plan is funded by a combination of wage withholdings by Plan participants and Company contributions that are deposited into the Plan's trust fund. Upon their deposit into the Plan's trust fund, all participant contributions and Company contributions become assets of the Plan.

106. As an individual account, defined contribution retirement plan, the Sonoco Plan "provides for an individual account for each participant and for benefits solely upon the amount

30

contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

107.    Plan participants pay for the Plan's administrative expenses through a direct charge to their accounts quarterly.

108.    The deduction of these administrative expenses from participant accounts reduces the funds available to participants for distribution and/or investing.

109.    When a participant has a break in service prior to full vesting of the Company's contributions, the participant forfeits the balance of unvested Company contributions in his or her individual account and Defendants exercise discretionary authority and control over how these Plan assets are thereafter reallocated.

110.    At the discretion of Defendants, forfeited nonvested accounts may be used to pay the Plan's administrative expenses or reduce the Company's contributions to the Plan.

111.    Although Defendants have discretion to use the forfeited funds to pay Plan administrative expenses, and thereby reduce or eliminate the amounts charged to the participants' individual accounts to cover such expenses, Defendants have consistently declined to use any of these Plan assets for such purposes over the class period.

112.    Instead, Defendants have consistently chosen to utilize the forfeited funds in the Plan exclusively for the Company's own benefit, to the detriment of the Plan and its participants, by using these Plan assets solely to reduce Company contributions to the Plan.

113.    In 2018, Company contributions to the Plan were reduced by $221,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any Plan expenses.

114.    In 2019, Company contributions to the Plan were reduced by $844,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any Plan expenses.

115.    In 2020, Company contributions to the Plan were reduced by $552,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any Plan expenses.

116.    In 2021, Company contributions to the Plan were reduced by $100,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any Plan expenses.

117.    In 2022, Company contributions to the Plan were reduced by $550,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any Plan expenses.

118.    While Defendants' reallocation of the forfeitures in the Plan's trust fund to reduce its contributions benefitted the Company by reducing its own contribution expenses, it harmed the Plan, along with its participants and beneficiaries, by reducing Company contributions that would otherwise have increased Plan assets and by causing participants to incur deductions from their individual accounts each quarter to cover administrative expenses that would otherwise have been covered in whole or in part by utilizing forfeited funds.

### CLASS ACTION ALLEGATIONS

119.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

120.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

All persons who were participants in or beneficiaries of the Sonoco Plan, from the earliest allowable time through the present (the "Class Period").

121.    The members of the Class are so numerous that joinder is impractical. According to the Sonoco Plan's Annual Form 5500 for the year ending 2022, filed with the U.S. Department of Labor, there were 12,946 Sonoco Plan participants with account balances as of December 31, 2022.

122.    Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Sonoco Plan and suffered injuries because of Defendants' ERISA fiduciary breaches. Defendants treated Plaintiff consistently with other Class members and managed the Sonoco Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' ERISA violations.

123.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

   a.    Whether Defendants are/were fiduciaries of the Sonoco Plan;

   b.    Whether Defendants breached their fiduciary duty by engaging in the conduct described herein;

   c.    Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Sonoco Plan was being managed in compliance with ERISA;

   d.    Whether Defendants engaged in prohibited transactions with Plan assets;

33

e.      Whether Defendants violated the anti-inurement provision of ERISA by using Plan assets for their own benefit;

f.      The proper form of equitable and injunctive relief; and

g.      The proper measure of monetary relief.

124.    Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of complex class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

125.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class certification in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Proceeding as a class is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

126.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(asserted against Committee Defendants)**

127.    Plaintiff re-alleges and incorporates herein by reference all paragraphs 1–126 of this Complaint as if fully set forth herein.

128.    At all relevant times, the Committee Defendants were fiduciaries of the Sonoco Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Sonoco Plan or disposition of the Sonoco Plan's assets.

129.    As fiduciaries of the Sonoco Plan, the Committee Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Sonoco Plan for the sole and exclusive benefit of the Sonoco Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

130.    As demonstrated above, the Committee Defendants breached their fiduciary duties in several ways, including, but not limited to: (1) failing to control the administrative and recordkeeping expenses of the Sonoco Plan; (2) failing to investigate the availability of lower-cost identical products of certain mutual funds and lower cost collective investment trust funds in the Sonoco Plan; and (3) declining to use the forfeited funds in the Plan to eliminate the administrative expenses charged to participant accounts and instead using such Plan assets to reduce the Company's own contributions to the Plan.

131.    The Committee Defendants failed to engage in a reasoned and impartial decision-making process to determine that using the forfeited funds in the Plan to reduce the Company's own contribution expenses, as opposed to the administrative expenses charged to participant accounts, was in the best interest of the Plan's participants or was prudent, and failed to consider

whether participants would be better served by another use of these Plan assets after considering all relevant factors.

132. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Sonoco Plan and its participants suffered millions of dollars of losses due to excessive costs and lower net investment returns, and unmitigated administrative expenses. Likewise, by declining to use forfeited funds in the Plan to eliminate the administrative expenses charged to participant accounts, and instead using such Plan assets to reduce the Company's own contribution expenses, Committee Defendants caused the Plan to receive fewer contributions that would otherwise have increased Plan assets and caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by using the forfeited funds to pay Plan expenses.

133. Had the Committee Defendants complied with their fiduciary obligations, the Sonoco Plan and its participants would not have suffered these losses, and the Sonoco Plan's participants would have had more money available to them for their retirement.

134. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Committee Defendants are liable to restore to the Sonoco Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

135. Moreover, the Committee Defendants knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit a breach of fiduciary duty in the administration of their specific responsibility, and/or knew of a breach by another fiduciary and failed to make any reasonable and timely effort under the circumstances to remedy or cure such

36

breach. Accordingly, the Committee Defendants are also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty of Loyalty (29 U.S.C. § 1104(a)(1)(A))
### (asserted against Committee Defendants)

136.    Plaintiff re-alleges and incorporates herein by reference all paragraphs 1–126 of this Complaint as if fully set forth herein.

137.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), Committee Defendants were required to discharge their duties to the Sonoco Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

138.    The Committee Defendants have continually breached this duty of loyalty with respect to their control and management of the Plan's assets throughout the class period by choosing to use forfeited funds in the Plan for the benefit of the Company rather than solely in the interest of the participants and beneficiaries.

139.    Instead of acting solely in the interest of Plan participants by use forfeited funds in the Plan to reduce or eliminate the administrative expenses charged to their individual accounts, Committee Defendants chose to use these Plan assets for the purpose of reducing Sonoco's future contributions to the Plan, thereby saving Sonoco over millions of dollars at the expense of the Plan which received decreased Company contributions and its participants and beneficiaries who were forced to incur avoidable expense deductions to their individual accounts.

140.    As a direct and proximate result of the Committee Defendants' fiduciary breaches described herein, the Plan suffered injury and loss for which they are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation,

37

the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

141. Moreover, the Committee Defendants knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit a breach of fiduciary duty in the administration of their specific responsibility, and/or knew of a breach by another fiduciary and failed to make any reasonable and timely effort under the circumstances to remedy or cure such breach. Accordingly, the Committee Defendants are also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**THIRD CLAIM FOR RELIEF**
**Breach of ERISA's Anti-Inurement Provision**
**(29 U.S.C. § 1103(c)(1))**
**(asserted against Committee Defendants)**

142. Plaintiff re-alleges and incorporates herein by reference all paragraphs 1–126 of this Complaint as if fully set forth herein.

143. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

144. The balance in a participant's account that a participant forfeits when incurring a break in service prior to full vesting of the Company's contributions to the participant's account is an asset of the Sonoco Plan.

145. By electing to use these Plan assets as a substitute for the Company's own future contributions to the Plan, thereby saving the Company millions of dollars in contribution expenses, the Committee Defendants caused the assets of the Plan to inure to the benefit of the employer in violation of 29 U.S.C. 1103(c)(1). Each Defendant is personally liable under 29

U.S.C. § 1109(a) to make good to the Plan any losses resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

### FOURTH CLAIM FOR RELIEF
### Prohibited Transactions
### (asserted against Sonoco and the Committee Defendants)

146. Plaintiff re-alleges and incorporates herein by reference all paragraphs 1–126 of this Complaint as if fully set forth herein.

147. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

148. Sonoco and the Committee Defendants are parties in interest, as that term is defined under 29 U.S.C. §1002(14), because they are Plan fiduciaries and because Sonoco is the employer of Plan participants.

149. By electing to use forfeited funds in the Plan as a substitute for future employer contributions to the Plan, and thereby saving the Company millions of dollars in contribution expenses, Committee Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or a use of Plan assets by or for the benefit of a party in interest.

150. As a result of these prohibited transactions, Committee Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

151. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to

the Plan any losses to the Plan resulting from the prohibited transactions alleged in this claim, to reverse and/or correct the prohibited transactions, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**FIFTH CLAIM FOR RELIEF**
**Prohibited Transactions**
**(asserted against Sonoco and the Committee Defendants)**

152.    Plaintiff re-alleges and incorporates herein by reference all paragraphs 1–126 of this Complaint as if fully set forth herein.

153.    29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

154.    Sonoco and the Committee Defendants violated this prohibition in their management and control of forfeiture funds in the Plan. By utilizing these Plan assets as a substitute for future employer contributions to the Plan, thereby saving the Company millions of dollars in contribution expenses, Committee Defendants dealt with the assets of the Plan in their own interest and for their own account.

155.    As a result of this prohibited conduct, Committee Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

156.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**SIXTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(asserted against Sonoco and the Board Defendants)**

157.    Plaintiff re-alleges and incorporates herein by reference all paragraphs 1–126 of this Complaint as if fully set forth herein.

158.    Defendants Sonoco and the Board Defendants had the authority and obligation to monitor the Committee and were aware that the Committee had critical responsibilities as a fiduciary of the Sonoco Plan.

159.    In light of this authority, Sonoco and the Board Defendants had a duty and responsibility to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Sonoco Plan in the event that the Committee was not fulfilling those duties.

160.    Sonoco and the Board Defendants also had a duty and responsibility to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Sonoco Plan's investments and administrative service providers (including its recordkeeper), and use of forfeited contributions; and reported regularly to Sonoco.

161.    Sonoco and the Board Defendants breached their fiduciary monitoring duties by, among other things:

>       a.    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Sonoco Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

41

b.      failing to monitor the processes by which the Sonoco Plan's recordkeeper was evaluated and the Committee's failure to solicit recordkeeping bids to ensure it paid reasonable fees for recordkeeping services;

c.      failing to remove the Committee as a fiduciary whose performance was inadequate in that it caused the Sonoco Plan to pay excessive recordkeeping fees to the detriment of the Sonoco Plan and the retirement savings of the Sonoco Plan's participants; and

d.      failing to monitor the Committee's use of forfeited funds in the Plan and by failing to take steps to ensure that the Committee was discharging its duties with respect to Plan assets for the sole benefit of Plan participants and beneficiaries.

162.    As a direct and proximate result of the foregoing breaches of the duty to monitor, the Sonoco Plan suffered millions of dollars of losses. Had Sonoco and the Board Defendants complied with their fiduciary obligations, the Sonoco Plan would not have suffered these losses, and participants of the Sonoco Plan would have had more money available to them for their retirement.

163.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Sonoco and the Board Defendants are liable to restore to the Sonoco Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

42

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of a class of similarly situated participants, prays that judgment be entered against Defendants on all claims and request that the Court awards the following relief:

(A)     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

(B)     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

(C)     A declaration that each Defendant has breached their fiduciary duties under ERISA;

(D)     An order compelling the Defendants to make good to the Sonoco Plan all losses resulting from Defendants' breaches of their fiduciary duties, including losses to the Sonoco Plan resulting from imprudent investment of the Sonoco Plan's assets, and to restore to the Sonoco Plan all profits the Defendants made through use of the Sonoco Plan's assets, and to restore to the Sonoco Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

(E)     Actual damages in the amount of any losses the Sonoco Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(F)     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(G)     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Sonoco Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

43

(H)     An award of pre-judgment interest;

(I)     An award of costs pursuant to 29 U.S.C. § 1132(g);

(J)     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

(K)     Such other and further relief as the Court deems equitable and just.


Dated: August 8, 2024

Respectfully submitted,

/s/Shane W. Rogers
Shane W. Rogers (Federal Bar No.: 7364)
**JOHNSON, SMITH, HIBBARD & WILDMAN
LAW FIRM, L.L.P.**
220 N. Church Street, Suite 4 (29306)
Post Office Drawer 5587
Spartanburg, South Carolina 29304
Telephone: (864) 582-8121
Facsimile: (864) 585-5328
Email: srogers@jshwlaw.com

Andrew Shamis[†]
**SHAMIS & GENTILE, P.A.**
14 NE 1st Street, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
ashamis@shamisgentile.com

Gabriel Mandler*
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Tel: (786) 673-2405
gabriel@edelsberglaw.com

Joshua R. Jacobson*
**JACOBSON PHILLIPS PLLC**
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057

44

joshua@jacobsonphillips.com

†*pro hac vice* application forthcoming
*admitted *pro hac vice*